IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VMEDEX, INC., NEURON DYNAMICS, LLC, BRENT PATTON, LORRAINE GROSSO, JOSEPH GROSSO, ROBERT NIXON, ERIC WESTBROOK, GARTH SCHNEIDER, MARK MCCURRY, CURT VAN CALSTER, JEFFREY WICKMAN, | ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 18-1662 (MN) |
| TDS OPERATING, INC., TRANSACTION DATA SYSTEMS, INC., RX30 HOLDINGS, LLC, GTCR, LLC, JUDE DIETERMAN, STEVE WUBKER, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## **MEMORANDUM OPINION**

Ann M. Kashishian, KASHISHIAN LAW LLC, Wilmington, Delaware.  Marlo J. Hittman, LAW OFFICE OF MARLO J. HITTMAN, Livingston, NJ.  *Counsel for Plaintiffs.*

Marc S. Casarino, WHITE & WILLIAMS LLP, Wilmington, Delaware.  David M. Friebus, BAKER & HOSTETLER LLP, Chicago, Illinois.  *Counsel for Defendants.*

August 21, 2020
Wilmington, Delaware

NOREIKA, U.S. DISTRICT JUDGE:

Plaintiffs vMedex, Inc. ("vMedex") and Neuron Dynamics, LLC ("Neuron"), and Brent Patton, Lorraine Grosso, Joseph Grosso, Robert Nixon, Eric Westbrook, Garth Schneider, Mark McCurry, Curt Van Calster, and Jeffrey Wickman (collectively, "Individual Plaintiffs") have sued Defendants TDS Operating, Inc. ("TDS Operating"), Transaction Data Systems, Inc. ("Transaction Data"), Rx30 Holdings, LLC ("Rx30"), GTCR, LLC ("GTCR") (collectively, "Entity Defendants"), and Jude Dieterman and Steve Wubker, alleging seven counts of contract and tort liabilities related to asset purchase and employment agreements and one count for violation of the Age Discrimination in Employment Act ("ADEA").[1]  Defendants filed a Motion to Dismiss Plaintiffs' Second Amended Complaint for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 for the claims arising under the ADEA, and pursuant to 28 U.S.C. § 1332 for the remaining claims.  For the following reasons, Defendants' Motion to Dismiss is GRANTED-IN-PART and DENIED-IN-PART.

I.      **BACKGROUND**

The facts alleged are as follows:

A.      **The Parties**

Plaintiff vMedex is a Nevada corporation that provided medication therapy management software to pharmacies.  (D.I. 44 ¶¶ 25, 114).  Plaintiff Neuron is a Nevada limited liability company and the majority shareholder of vMedex.  (*Id.* ¶¶ 26, 27).  All Individual Plaintiffs other than Brent Patton were affiliated with vMedex and served in technical or operational roles for vMedex, Neuron, or both.  (*Id.* ¶¶ 37, 117).  All Individual Plaintiffs other than Brent Patton and

---

[1]      The Counts are labeled I-IX but Count IV was "intentionally omitted."

Lorraine Grosso were equity holders of vMedex, Neuron, or both. (*Id.* ¶ 119). Individual Plaintiffs were hired by Defendants in or around 2016. (*Id.* ¶¶ 182–84).

Defendant TDS Operating is a Delaware corporation. (*Id.* ¶ 40). Defendant Transaction Data is a Florida corporation and the controlling shareholder of TDS Operating. (*Id.* ¶¶ 41, 66). Defendant Rx30 is a Delaware limited liability corporation and, through a series of intermediaries, the controlling shareholder of Transaction Data. (*Id.* ¶¶ 42, 63–65). Defendant GTCR is a Delaware limited liability company and the sole owner of both Transaction Data and Rx30. (*Id.* ¶¶ 43, 44). Defendant Jude Dieterman is the current President and CEO of Transaction Data, doing business as Rx30, (*id.* ¶ 166), holding positions formerly held by Defendant Steve Wubker, (*id.* ¶¶ 166, 388).

At the direction of TDS Operating, Transaction Data, and Rx30, certain Individual Plaintiffs authored a computer program called StarGuard, to be used by subscribers to the Rx30 pharmaceutical software platform. (*Id.* ¶ 115). StarGuard provided pharmacies with practice management services and tools to assure compliance with performance obligations imposed by government reimbursement programs and insurance providers. (*Id.* ¶ 117). StarGuard was integrated into the Rx30 software and deployed through the Rx30 interface. (*Id.*). This business arrangement was memorialized in a Joint Venture Agreement between vMedex and Transaction Data on August 15, 2014. (*Id.* ¶ 120).

## B.    The Asset Purchase Agreement

In 2016, after a dispute over the Joint Venture Agreement arose between parties, Steve Wubker proposed a new agreement. (*Id.* ¶ 135). Wubker proposed that vMedex sell its assets to TDS Operating, which, through its affiliates, could expand the reach of vMedex products. (*Id.* ¶¶ 139–42). TDS Operating, vMedex, and Neuron entered into an Asset Purchase Agreement ("APA") on April 1, 2016, under which vMedex and Neuron sold to TDS Operating assets

2

including StarGuard.  The APA forgave all amounts due under the Joint Venture Agreement and rendered the Joint Venture Agreement null and void.  (D.I. 47, Ex. B § 2.2).

Under the APA, TDS Operating was to pay vMedex and Neuron $1 million at closing in consideration for the asset purchase.  (*Id.* § 2.1).  vMedex and Neuron were also eligible to receive earn-out payments based on the number of customers – defined as unique pharmacy stores in good standing – licensing their software products or services at the end of 2017 and 2018.  (*Id.* § 2.3). If TDS Operating elected to bundle the purchased software with other products or services offered by TDS Operating, a customer of the bundled software would count toward the customer base for purposes of calculating the earn-out payments to vMedex and Neuron.  (*Id.* § 2.3.3).

The earn-out payments were calculated as $6,000 for every customer that exceeded a certain threshold by the last day of the year, up to a certain cap.  For 2017, the threshold was 1,250 stores, with the payment capped at $1.5 million (250 stores above the threshold) ("2017 Earn-Out").  (*Id.* § 2.3.1(a)–(b)).  For 2018, the threshold was 2,000 stores, with the payment capped at $1.5 million.  (*Id.* § 2.3.2(a)–(b)).  But if vMedex and Neuron had earned the maximum amount under the 2017 Earn-Out and had at least 2,500 customers by the end of 2018, vMedex and Neuron would be entitled to a payment of $1.9 million ("2018 Earn-Out").  (*Id.*).  TDS Operating was to provide statements of the year-end earn-out payment calculations no later than March 31 of the following year, with payment to follow within five business days.  (*Id.* §§ 2.3.1, 2.3.2, 2.5).

Upon receipt of this statement, vMedex and Neuron would have 30 days to inspect "any books and records related to the 2017 Customer Base or the 2018 Customer Base, as applicable, upon reasonable notice to [TDS Operating]."  (*Id.* § 2.4).  Within this 30-day period, vMedex and Neuron could object to the earn-out calculation via a written notice, which would initiate a process of negotiations and arbitration or litigation between parties.  (*Id.*).  In any such arbitration or

3

litigation, the non-prevailing party would be liable to pay the collection costs of the prevailing party. (*Id.*).

The APA also imposes on TDS Operating a duty to consult with vMedex and Neuron on the marketing and distribution of their products, but otherwise gives TDS Operating free rein over business decisions pertaining to the acquired assets:

> The Buyer [TDS Operating] will consult with representatives of the Seller [vMedex and Neuron], in good faith, regarding the appropriate marketing and distribution strategies for maximizing the 2017 Customer Base and the 2018 Customer Base, as applicable. However, notwithstanding the foregoing, the Parties acknowledge and agree that following the Closing, the Buyer shall have absolute discretion with regard to all matters relating to the operation of the Business.

(*Id.* § 2.6).

The APA designates Delaware law to resolve disputes over the contract. (*Id.* § 9.11).

### C.    **Employment of Individual Plaintiffs**

Upon acquiring StarGuard pursuant to the APA, Defendants set out to hire vMedex and Neuron personnel, to gain their specialized skill in healthcare technology and ostensibly to ensure continuity of service for StarGuard users. (D.I. 44 ¶¶ 169–70, 172). This conduct constituted a so-called "acqui-hire" scheme. (*Id.* ¶ 176). At or around April 1, 2016, all Individual Plaintiffs except Brent Patton and Garth Schneider accepted written offers of employment from Transaction Data, on Rx30 letterhead. (*Id.* ¶¶ 182, 187). The individuals then executed confidentiality/non-compete agreements with Transaction Data, (*id.* ¶ 190), and employment agreements with Rx30, (*id.* ¶ 192). The employment agreement and non-compete agreement both designate Delaware law to resolve contract disputes. (D.I. 47, Ex. C § 2(f); Ex. D § 4).

The new hires from vMedex and Neuron were assigned to the Clinical Services Division of Transaction Data, with Joseph Grosso serving as the president of the division and Lorraine

Grosso as its director.  (D.I. 44 ¶ 319).  These seven new hires received their paychecks from TDS Operating.  (*Id.* ¶ 198).

Shortly after executing the APA, Defendants hired Brent Patton to the Clinical Services Division.  (*Id.* ¶¶ 184, 323).  In or around November 2016, Defendants hired Garth Schneider, a Neuron equity holder, to join the Clinical Services Division.  Neither Patton nor Schneider signed confidentiality/non-compete agreements or employment agreements with Defendants.  (*Id.* ¶¶ 323–24).  They received their paychecks from TDS Operating.  (*Id.*).

In early 2017, Joseph Grosso suggested that Defendants establish a call center to provide customer service support for StarGuard and other Rx30 products.  (*Id.* ¶ 341).  Wubker assigned Grosso to this task and promised him a salary increase and Rx30 equity if the call center was successful.  (*Id.* ¶¶ 343, 345).  Defendants then reallocated personnel, infrastructure, and resources from StarGuard to the call center.  (*Id.* ¶ 351).  By mid-2017, Rx30 was reportedly looking to hire as many as 100 people to staff the call center, performing duties of the kind performed by Clinical Services Division employees.  (*Id.* ¶ 356).

Eric Westbrook was the sole person employed by Defendants to maintain uninterrupted service of the StarGuard product.  (*Id.* ¶ 331).  In late 2017, Westbrook advised Defendants that the StarGuard servers needed to be updated to ensure continuous service.  (*Id.* ¶¶ 359–60).  When Defendants declined to act, Westbrook upgraded the servers, with Neuron assuming the cost.  (*Id.* ¶ 360).  To ensure continuous service of StarGuard, vMedex and Neuron also assumed the cost of maintaining and renewing StarGuard's security certificate.  (*Id.* ¶ 361).

### D.  **The 2017 Earn-Out**

In March 2018, TDS Operating issued a statement that vMedex and Neuron had not earned the 2017 Earn-Out payment.  (*Id.* ¶ 270).  vMedex and Neuron challenged their calculation based on spreadsheets produced at the direction of Defendants and updated monthly to facilitate customer

billing.  (*See id.* ¶¶ 267–68).  The calculation of the 2017 Earn-Out failed to account for about two-thirds of StarGuard customers on these spreadsheets.  (*Id.* ¶ 279).  These customers were omitted from the calculation because they received StarGuard for free along with a Rx30 license, a practice which Defendants began in 2017.  (*Id.* ¶ 263).  The parties disputed whether giving away StarGuard for free constituted bundling, under which Plaintiffs would be entitled to count these customers toward their year-end totals.  (*Id.* ¶¶ 276–77; D.I. 47 at 5).

After TDS Operating refused to pay the 2017 Earn-Out, vMedex and Neuron asserted their right under the APA to inspect the books and records of TDS Operating.  (D.I. 44 ¶ 285).  This demand was not honored, and vMedex and Neuron threatened suit to enforce the APA earn-out provision.  (*Id.* ¶¶ 286–87).  In July 2018, Defendants paid vMedex and Neuron $1.5 million, the maximum allowed under the 2017 Earn-Out, four months after the 2017 Earn-out would have become due.  (*Id.* ¶¶ 288–89).  Defendants, however, did not grant vMedex and Neuron access to TDS Operating records.  (*Id.* ¶ 377).

### E.   Layoff of Individual Plaintiffs

Around the time the parties disputed the 2017 Earn-Out, Defendants began laying off employees assigned to work on StarGuard, allegedly to avoid having to pay the 2018 Earn-Out.  (*Id.* ¶ 395).  On March 23, 2018, Jeffrey Wickman, Garth Schneider, Mark McCurry, Curt Van Calster, and several others not party to this suit, all over the age of 40, were terminated from the Clinical Services Division of Transaction Data.  (*Id.* ¶¶ 396–98).  Though Defendants claimed the terminations were due to a lack of work, the reduction in force coincided with the reported surge in hiring for the call center.  (*Id.* ¶ 399).  Wickman, Schneider, McCurry, and Van Calster had skills and experience that would have suited them to these call center positions.  (*Id.* ¶ 407).

On or around June 12, 2018, Rx30 terminated the remaining Individual Plaintiffs, Joseph and Lorraine Grosso, Robert Nixon, Eric Westbrook, and Brent Patton, allegedly because these

individuals had refused to provide Defendants with source code for StarGuard when asked. (*Id.* ¶¶ 418–19). Defendants, however, had acquired the StarGuard source code under the APA, (*id.* ¶ 231), and otherwise had the right to request replacement source code from vMedex or Neuron, (*id.* ¶ 391). Although these five Individual Plaintiffs were required to admit in writing that they were fired for cause, they were also offered severance packages. (*Id.* ¶ 430). These employees were also over the age of 40. (*Id.* ¶ 429).

Individual Plaintiffs received "Right to Sue" Letters from the Equal Employment Opportunity Commission, having asserted claims for age discrimination. (*Id.* ¶¶ 459–60).

### F.    Shut Down of StarGuard

By mid-2018, spreadsheets produced at the direction of Defendants showed 3,800 StarGuard customers, which exceeded the end-of-year threshold for vMedex and Neuron to qualify for the 2018 Earn-Out. (*Id.* ¶ 300). On or around August 15, 2018, allegedly to avoid paying the 2018 Earn-Out, Rx30 disabled access to StarGuard on the Rx30 platform. (*Id.* ¶¶ 447–48). TDS Operating then moved the StarGuard servers, including servers purchased by Neuron, from their location in New Mexico to a facility in Florida. (*Id.* ¶¶ 450–51). Shutting down website access to Rx30 did not, however, shut down the existing StarGuard licenses or unbundle them from the Rx30 program. (*Id.* ¶ 454). Defendants have not paid the 2018 Earn-Out, (*id.* ¶ 378), and have not allowed vMedex and Neuron to inspect the books and records of TDS Operating, (*id.* ¶ 377).

### G.    Procedural History

On October 25, 2018, Plaintiffs filed a Complaint against Defendants, including unnamed individuals John Does 1–10 and entities ABC Companies 1–10. (D.I. 1). They alleged nine counts: breach of contract (Count I), breach of the implied covenant of good faith and fair dealing as to the APA (Count II), tortious interference with contract (Count III), tortious interference with prospective economic advantage (Count IV), alter ego liability (Count V), violation of the Uniform

Fraudulent Transfer Act (Count VI), breach of the implied covenant of good faith and fair dealing as to the employment agreements (Count VII), violation of the ADEA (Count VIII), and fraudulent inducement (Count IX).  On December 12, 2018, Defendants moved to dismiss the Complaint under Rules 12(b)(1), 12(b)(2), and 12(b)(6) of the Federal Rules of Civil Procedure, for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim.  (D.I. 9).

On January 22, 2019, Plaintiffs filed their First Amended Complaint, naming the same Defendants and alleging the same nine counts.  (D.I. 20).  On February 11, 2019, Defendants moved to dismiss the First Amended Complaint for lack of subject matter jurisdiction, lack of personal jurisdiction, and failure to state a claim.  (D.I. 24).  After the parties fully briefed the motion to dismiss, this Court issued an Order to Show Cause why the First Amended Complaint should not be dismissed for lack of subject matter jurisdiction.  (D.I. 41).  On August 30, 2019, after a teleconference between the parties, this Court dismissed Counts I–VII and IX of the First Amended Complaint for lack of subject matter jurisdiction because the placeholder defendants destroyed diversity.

On September 20, 2019, Plaintiffs filed their Second Amended Complaint, naming the same Defendants except for John Does 1–10 and ABC Companies 1–10.  (D.I. 44).  The Second Amended Complaint pleaded the same counts as did the first two complaints, only omitting tortious interference with prospective economic advantage, formerly Count IV.   On October 25, 2019, Defendants moved to dismiss the Second Amended Complaint for failure to state a claim.  (D.I. 46).

## II.     LEGAL STANDARDS

### A.     Motion to Dismiss under Fed. R. Civ. P. 12(b)(6)

When deciding a motion to dismiss under Rule 12(b)(6), the Court must accept all well-pleaded factual allegations as true and view these in the light most favorable to the plaintiff.  *Mayer*

*v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010).  To survive a motion to dismiss, a complaint must plead sufficient factual matter to support "the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  In other words, the complaint must "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The complaint does not need detailed factual allegations, but must contain "more than labels and conclusions" and a "formulaic recitation of a cause of action's elements."  *Id.*  The Court, however, "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss."  *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429–30 (3d Cir. 1997)) (internal quotation marks omitted).

### B. Choice of Law

A federal district court "sitting in diversity must apply the choice-of-law rules of the state in which it sits to determine which state's substantive law governs the controversy before it."  *N.Z. Kiwifruit Mktg. Bd. v. City of Wilmington*, 825 F. Supp. 1180, 1185 (D. Del. 1993).

Delaware courts generally honor choice-of-law contractual provisions "if the designated jurisdiction bears some material relationship to the transaction."  *W. R. Berkley Corp. v. Dunai*, Civil Action No. 19-cv-01223-RGA, 2020 WL 3871087, at *2 (D. Del. Jul. 9, 2020) (quoting *Annan v. Wilmington Tr. Co.*, 559 A.2d 1289, 1293 (Del. 1989)) (internal quotation marks omitted).  But Delaware courts will not uphold a choice-of-law provision that is contrary to the public policy of the state whose laws would otherwise govern.  *Coface Collections N. Am. Inc. v. Newton*, 430 F. App'x 162, 166–67 (3d Cir. 2011).

## III.   DISCUSSION

### A.   The Asset Purchase Agreement

The APA includes a choice-of-law provision designating Delaware law.  TDS Operating is incorporated in Delaware, and Rx30 and GTCR are Delaware limited liability companies.  Thus, Delaware bears a material relationship to the agreement with vMedex and Neuron.  The Court does not find this designation offensive to public policy, and thus will apply Delaware law when assessing Plaintiffs' claims related to the APA.

### 1.   Breach of Contract (Count I)

The elements of a breach of contract claim are (1) a contractual obligation, (2) a breach of that obligation by the defendant, and (3) resulting damage to the plaintiff.  *H-M Wexford LLC v. Encorp, Inc.*, 832 A.2d 129, 140 (Del. Ch. 2003).  When interpreting a contract, a court will give clear and unambiguous terms their plain and ordinary meaning.  *Allied Cap. Corp. v. GC-Sun Holdings, L.P.*, 910 A.2d 1020, 1030 (Del. Ch. 2006).  To otherwise read ambiguities into a contract would create rights, liabilities, and duties not contemplated by the parties.  *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

Plaintiffs contend that Defendants committed several breaches of the APA.  First, they allege that Defendants failed to consult with Plaintiffs, in good faith, to strategize maximizing the StarGuard customer base.  (D.I. 44 ¶¶ 467–470, 473).  Second, they allege that Defendants failed to pay the 2017 Earn-Out timely, and subsequently failed to allow inspection of books and records.  (*Id.* ¶¶ 475, 477).  Third, they allege that Defendants breached their obligation to pay the 2018 Earn-Out and honor inspection rights related to this payment.  (*Id.* ¶¶ 481–82).  Fourth, they allege that Defendants are liable for the costs Plaintiffs incurred to collect the earn-out payments, as well as the cost of computer servers and certificates needed to operate StarGuard.  (*Id.* ¶ 476).

### a.   Duty to Consult

Plaintiffs have stated a plausible claim that Defendants breached their duty to consult regarding the marketing and distribution strategies for StarGuard.  The APA states that TDS Operating "will consult with representatives of [vMedex and Neuron], in good faith, regarding the appropriate marketing and distribution strategies for maximizing the 2017 Customer Base and the 2018 Customer Base."  (D.I. 47, Ex. B § 2.6).  Plaintiffs contend that Defendants did not consult in good faith regarding the marketing and distribution of StarGuard.  For example, they allege that Defendants decided to include StarGuard for free with other Rx30 products, apparently without consulting with Plaintiffs.  (D.I. 44 ¶ 263).  Because Plaintiffs' earn-out payments were contingent on the size of their customer base, it is plausible that Defendants' failure to consult caused Plaintiffs' alleged damage.  Thus, Plaintiffs have plausibly stated an obligation in the plain language of the APA, a breach of this obligation, and a resulting injury.

Defendants deny any breach as a result of shutting down StarGuard because TDS Operating had "absolute discretion" over this decision.  (D.I. 47 at 9).  To the extent Defendants argue that absolute discretion overrides their duty to consult, this argument ignores the plain language of the APA:

> The Buyer will consult with Representatives of the Seller, in good faith, regarding the appropriate marketing and distribution strategies for maximizing the 2017 Customer Base and the 2018 Customer Base, as applicable.  However, *notwithstanding the foregoing*, the Parties acknowledge and agree that following the Closing, the Buyer shall have absolute discretion with regard to all matters relating to the operation of the Business.

(D.I. 47, Ex. B § 2.6) (emphasis added).  The plain meaning of the term "notwithstanding" is "despite; in spite of."  Black's Law Dictionary (11th ed. 2019).  Thus, the parties intended the right to exercise absolute discretion to coexist with the duty to consult, not to supersede it.  Defendants'

interpretation would render the duty to consult mere surplusage.[2]  *See Intercept Pharms., Inc. v. Fiorucci*, 277 F. Supp. 3d 678 (D. Del. 2017) ("[C]ontractual language should be interpreted in a way that gives effect to all terms, so as not to render any part of the contract mere surplusage. Additionally, the contract must be read as a whole, and contractual provisions must be interpreted in a way that gives effect to every term of the instrument and reconciles all provisions of the instrument." (internal quotation marks, citations, and alterations omitted)).

Accordingly, Plaintiffs' claim that TDS Operating breached its duty to consult will not be dismissed.

### b. The 2017 Earn-Out

Plaintiffs have not plausibly stated a claim for breach of contract under the 2017 Earn-Out provision.  Though the parties disputed the size of StarGuard's customer base due to Defendants' bundling of Rx30 products and services, Defendants eventually paid Plaintiffs $1.5 million under the 2017 Earn-Out provision.  Whether Defendants' delay in paying vMedex and Neuron constituted a breach is an issue the Court need not decide because Plaintiffs have not alleged any resulting injury.  Plaintiffs also argue that Defendants breached the APA by failing to honor Plaintiffs' right to inspect books and records related to the calculation of the 2017 Earn-Out.  But the inspection right is not absolute.  The APA entitles vMedex and Neuron to inspect TDS Operating records for 30 days after receiving Defendants' earn-out calculation statement, and in order to resolve disputes over the StarGuard customer counts.  (D.I. 47, Ex. B § 2.4).  The

---

[2]      The Court disagrees with Plaintiffs' argument, advanced in their Answering Brief in Opposition to Defendants' Motion to Dismiss, that good-faith consultation was a condition precedent to absolute discretion.  (D.I. 48 at 7).  The most straightforward interpretation of the phrase "notwithstanding" in this context is that the APA both imposed the duty to consult and granted the privilege of absolute discretion.

inspection right does not extend indefinitely, and does not entitle Plaintiffs to review all of Defendants' records.

Plaintiffs also did not address Defendants' arguments related to the 2017 Earn-Out in their Answering Brief in Opposition to Defendants' Motion to Dismiss, so this argument is deemed waived.  *See Blakeman v. Freedom Rides, Inc.*, Civ. Action No. 12–416–LPS–CJB, 2013 WL 3503165, at *13 (D. Del. Jul. 10, 2013).  Thus, breach of contract claims related to the 2017 Earn-Out are dismissed.

### c.      <u>The 2018 Earn-Out</u>

Plaintiffs plausibly allege that Defendants breached the APA with regard to the 2018 Earn-Out.  Plaintiffs claim that Defendants began giving StarGuard licenses away free of charge along with Rx30 licenses in 2017, and a spreadsheet from mid-2018 showed more than 3,800 customers of Rx30.  Then, Defendants shut down internet access to StarGuard, which did not affect the existing licenses.   Considering that the lower threshold for the 2018 Earn-Out was 2,000 customers, it is plausible that the number of StarGuard customers exceeded that number – and perhaps even the 2,500-customer threshold to qualify for the $1.9 million earn-out payment – by December 31, 2018.  Yet, TDS Operating has not paid the 2018 Earn-Out, nor does it appear to have sent vMedex and Neuron a statement of its payment calculation, expressly required by the APA.

Defendants argue that this claim fails because bundling and shutting down StarGuard were within TDS Operating's absolute discretion under the APA.  (D.I. 47 at 9).  It is not Defendants' alleged conduct that plausibly establishes breach of their duties under the APA.  Indeed, the Court does not credit Plaintiffs' conclusory allegation that Defendants engaged in this conduct specifically to avoid liability for the 2018 Earn-Out.  But the Court finds plausible that, despite these actions, Plaintiffs still reached the earn-out benchmarks based on the APA's definition of

customers and formula for the earn-out payments.  Thus, Plaintiffs have raised "a reasonable expectation that discovery will reveal evidence" that TDS Operating breached its obligations under the 2018 Earn-Out, and this claim will not be dismissed.  *See Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008).

### d.    Reimbursement of Costs

Plaintiffs fail to state a claim that Defendants are liable to reimburse various costs. Plaintiffs first claim that Defendants are liable for costs incurred to collect the disputed 2017 Earn-Out.  This liability was not contemplated by the parties.  The APA provides only that the non-prevailing party to "any arbitration or litigation related to the Earn-Out Payments" will be responsible for the legal fees and expenses of the prevailing party.  (D.I. 47 § 2.4).  Because Plaintiffs did not prevail – or even engage – in arbitration or litigation over the earn-out payments, no obligation accrued to Defendants.  Plaintiffs also claim that Defendants are liable to reimburse Neuron for the cost of new servers and security certificates for the continuous operation of StarGuard.  Plaintiffs do not allege, and the APA does not provide, that Defendants had any contractual obligation to reimburse these costs.  Plaintiffs' claims that Defendants are liable for the costs of earn-out collection and StarGuard operational expenses are thus dismissed.

### 2.    Breach of Implied Covenant of Good Faith and Fair Dealing (Count II)

Under the implied covenant of good faith and fair dealing, parties to a contract must "refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain."  *Luster v. PuraCap Labs., LLC*, C.A. No. 18-00503 (MN), 2018 WL 6492583, at *2 (D. Del. 2018).  To state a claim of breach of the implied covenant of good faith and fair dealing, a plaintiff must allege (1) a specific implied contractual obligation, (2) a breach of that obligation by the defendant, and (3) resulting damage to the plaintiff. *Kuroda v. SPJC Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009).  To survive

a motion to dismiss, a complaint claiming breach of the implied covenant of good faith and fair dealing must allege facts different from those underlying a related breach of contract claim. *GWO Litig. Tr. v. Spring Sols., Inc.*, C.A. No. N17C-06-356 PRW, 2018 WL 5309477, at *6 (Del. Oct. 25, 2018).

The implied covenant "only applies where a contract lacks specific language governing an issue" and where the implied term does not override the express terms of a contract. *Haney v. Blackhawk Network Holdings, Inc.*, C.A. No. 10851-VCN, 2016 WL 769595, at *8 (Del. Ch. Feb. 26, 2016). When the court finds a gap in the contract, it nonetheless will only read in an implied covenant if the term were so fundamental that the parties would not have needed to negotiate or memorialize it. *Allied Cap. Corp.*, 910 A.2d at 1032–33. Accordingly, the implied covenant of good faith and fair dealing is rarely successfully invoked. *Kuroda*, 971 A.2d at 888.

"As seems all too common in disputes over earn-out payments," Plaintiffs pair their breach of contract claims with a claim that Defendants breached the implied covenant of good faith and fair dealing. *See Fortis Advisors LLC v. Dialog Semiconductor PLC*, C.A. No. 9522-CB, 2015 WL 401371, at *1 (Del. Ch. Jan. 30, 2015). In support of their claim of breach of the implied covenant, Plaintiffs point to behavior indicating that Defendants intended to frustrate the purpose of the contract. For example, TDS Operating undercounted customers to avoid the 2017 Earn-Out and shut down StarGuard operations to avoid the 2018 Earn-Out. And TDS Operating never consulted with vMedex or Neuron about the marketing and distribution of StarGuard. Further, that Defendants hired only Westbrook to maintain continuous StarGuard functionality shows Defendants had no intention to perform the contract.

These allegations fail to plausibly show a breach of the implied covenant of good faith and fair dealing. As a threshold matter, the Second Amended Complaint does not identify a gap in the

APA that the Court should fill with an implied contractual obligation. In their answer to Defendants' Motion to Dismiss, Plaintiffs argue that the contract is silent as to giving one party the unilateral right to destroy the fruits of the APA, and the parties would have considered a prohibition against this conduct to be so fundamental as to go without saying. (D.I. 48 at 13).

This later-pleaded argument is not persuasive. The APA gave TDS Operating "absolute discretion" in business decisions over assets acquired under the APA, which is clearly a robust privilege. (D.I. 47, Ex. B § 2.6). The duty to consult over marketing and distribution decisions would have checked this exercise of power. Plaintiffs essentially ask the Court to infer additional protections for vMedex and Neuron, arguing that they would not have entered into an agreement that did not protect their interests. The Court, however, will not add terms when it is apparent that the parties already considered and bargained for them. *See Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010) ("[W]e must . . . not rewrite [a] contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal. Parties have a right to enter into good and bad contracts, the law enforces both."). Because Plaintiffs do not plausibly state a gap in the APA that the implied covenant of good faith and fair dealing would fill, this claim is dismissed.

### 3. Tortious Interference with Contract (Count III)

A claim for tortious interference with contract requires "(1) a contract, (2) about which defendant knew and (3) an intentional act that is a significant factor in causing the breach of such contract (4) without justification (5) which causes injury." *Anderson v. Wachovia Mtg. Corp.*, 497 F. Supp. 2d 572, 583 (Del. 2007). For a claim of tortious interference with contractual relations to survive a motion to dismiss, the complaint must first plausibly allege an underlying breach of contract. *Allied Cap. Corp.*, 910 A.2d at 1036.

Only nonparties to a contract may be liable for tortious interference with the contract. *Kuroda*, 971 A.2d at 884.  By extension, nonparties with an economic interest in the contract may enjoy an "interference privilege" or "affiliate privilege" against this liability.  *AJZN, Inc. v. Yu*, Civil Action No. 13-149 GMS, 2015 WL 331937, at *12 (D. Del. Jan. 26, 2015).  Similarly, officers and directors of a corporation may be personally liable for tortious interference with a contract involving the corporation if and only if their interference exceeded the scope of their agency.  *Goldman v. Pogo.com, Inc.*, No. CIV.A. 18532-NC, 2002 WL 1358760, at *8 (Del. Ch. June 14, 2002).  A plaintiff alleging tortious interference with contractual relations bears the burden of pleading and proving that an affiliated nonparty has acted outside the scope of their affiliation with the contracting party, and thus should be liable for tortiously interfering with the contract.  *Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 590–91 (Del. Ch. 1994).

Plaintiffs allege that all Defendants except TDS Operating tortiously interfered with both the APA between TDS Operating and vMedex/Neuron and the employment contracts of the nine Individual Plaintiffs, "[t]o the extent the Court ultimately consider[s]" this claim.  (D.I. 44 ¶¶ 512, 519).  A claim of tortious interference with a contract requires an underlying breach of contract. Here, all claims based on the breach of the implied covenant of good faith and fair dealing as to the APA, (*see supra* Section III.A.2.), and as to the employment agreement, (*see infra* Section III.B.1.), are dismissed because those underlying breach-of-contract claims are dismissed. *See Allied Cap. Corp.*, 910 A.2d at 1036.  The claim of tortious interference is similarly dismissed as to the claim that TDS Operating breached the APA relating to the 2017 Earn-Out and reimbursement of costs, which has been dismissed.  (*See supra* Sections III.A.1.b, III.A.1.d.). Thus, the claim of tortious interference is considered only as to the surviving claims that TDS

Operating breached the APA by failing to consult and in connection with its obligations relating to the 2018 Earn-Out.  (*See supra* Sections III.A.1.a., III.A.1.c.).

As to those claims, Plaintiffs fail to plead that nonparty Defendants – entities GTCR, Transaction Data, and Rx30, and individuals Wubker and Dieterman – tortiously interfered with the APA.  Plaintiffs state, without factual support, that these nonparty Defendants "each had no legal or equitable interest in the actions undertaken."  (D.I. 44 ¶ 520).  The Court need not credit this conclusory statement, which merely recites the legal standard to overcome the presumption that economically interested nonparties cannot tortiously interfere in a contract.  *See Twombly*, 550 U.S. at 555.  Similarly, Plaintiffs state in their answer that Wubker and Dieterman are sued in their individual capacities, rather than as CEO and President of Entity Defendants.  (D.I. 48 at 16).  Merely saying that the officers are sued for personal rather than corporate conduct does not overcome the interference privilege for economically interested nonparties.  Furthermore, Wubker's alleged tortious conduct – including making false statements to induce Plaintiffs to enter into the APA, underreporting the number of StarGuard customers, and scheming to thwart the APA – which Plaintiffs claim continued under Dieterman, took place within the scope of Wubker and Dieterman's leadership of the Entity Defendants.  Thus, Wubker and Dieterman cannot be individually liable for tortious interference with the APA, and this claim fails.  *See Goldman*, 2002 WL 1358760, at *8.

Moreover, the cursory claim of the nonparties' disinterest flies in the face of Plaintiffs' repeated contention that all Entity Defendants were interconnected.  Indeed, the Second Amended Complaint alleges that GTCR controls and owns Rx30 and Transaction Data, which in turn control TDS Operating.  To support the contention that Entity Defendants were "working jointly with each other without any clear indication as to the respective boundaries of the entities," the Second

18

Amended Complaint alleges that Individual Plaintiffs received employment offers from Rx30 and Transaction Data jointly; executed confidentiality agreements with Transaction Data and employment agreements with Rx30; were assigned to work for Transaction Data; and received paychecks from TDS Operating.   (D.I. 44 ¶ 195).   If Entity Defendants were indeed so interdependent, it is implausible that their unspecified tortious interference with the APA was not done out of their economic interest in TDS Operating.

Thus, Plaintiffs have not plausibly established that the nonparty Defendants interfered with the APA outside the scope of their affiliation and economic interest in TDS Operating, and thus the claim of tortious interference is dismissed.

### 4.   Alter Ego Liability (Count V)

In rare circumstances, Delaware courts will disregard the corporate form and hold one corporate entity liable for the obligations of another entity that is its alter ego.  *See Marnavi S.p.A. v. Keehan*, 900 F. Supp. 2d 377, 392, 396 (D. Del. 2012) (discussing the alter ego theory of personal jurisdiction and extending analysis to alter ego theory of liability).  A plaintiff claiming alter ego liability must allege facts supporting the inference that the defendant's corporate boundaries are a sham to defraud investors and creditors.  *E.I. du Pont de Nemours & Co. v. Agfa-Gavaert NV*, 335 F. Supp. 3d 657, 675 (D. Del. 2018).  Courts deciding whether to disregard corporate boundaries and pierce the corporate veil consider several factors including the capitalization and solvency of the corporations, whether corporate formalities were observed, and whether the company was merely a façade for the dominant shareholder to siphon company funds. *Id.*  Courts will also pierce the corporate veil in the interests of justice and public policy.  *Id.*

Plaintiffs argue that all Entity Defendants, as alter egos of each other, should share liability to Plaintiffs.   To support this claim for corporate veil-piercing, Plaintiffs allege that Entity

Defendants operate interchangeably.  For example, Defendants hold out Rx30 as the business alias of Transaction Data, when in fact Rx30 appears to own and control Transaction Data.  Plaintiffs also offer that Individual Plaintiffs are engaged with different Entity Defendants for their employment offers, employment agreements, non-compete agreements, and pay arrangements. Furthermore, the entities shared officers and directors, operated out of the same locations, and commingled funds, as evidenced by individuals being employed by one entity and paid by another. And several similarly named Rx30 corporate entities were created on the same day, then quickly merged in a process that was "little more than a shell game."  (D.I. 44 ¶ 546).

These allegations do not support a reasonable inference that Defendants misused the corporate form.  The parent–subsidiary relationships, similar corporate names, and shared officers may have confused Plaintiffs, but nothing indicates that these factors resulted from an improper attempt to silo liability, siphon funds, or perpetrate fraud.  Thus, Plaintiffs' claim of alter ego liability across Defendants is dismissed.

### 5. <u>Fraudulent Conveyance (Count VI)</u>

Under the Delaware Uniform Fraudulent Transfers Act ("UFTA"), a debtor commits fraud by making a transfer or incurring an obligation with the actual intent to hinder, delay, or defraud a creditor.  6 Del. C. § 1304(a)(1).  A finding of actual intent can be premised on factors including whether the transfer or obligation was to an insider, the debtor retained possession of the transferred property, and the debtor removed or concealed assets.  6 Del. C. § 1304(b)(1), (b)(2), (b)(7).  A plaintiff alleging violation of the Delaware UFTA must meet the heightened pleading standard under Rule 9(b) of the Federal Rules of Civil Procedure by showing a defendant's "intent to defraud with specific supporting facts describing the circumstances of the transfer."  *AJZN, Inc.*, 2015 WL 331937, at *13 (quoting *Quadrant Structured Prods. Co. v. Vertin*, C.A. No. 6990, 2014

WL 5099428, at *31 (Del. Ch. Oct. 1, 2014)).  "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  FED. R. CIV. P. 9(b).

Plaintiffs fail to state a claim of fraudulent conveyance under the Delaware UFTA.  First, the adduced facts do not show an intent to defraud Plaintiffs.  The Second Amended Complaint alleges that Defendants owe Plaintiffs a $1.9-million liability.  (*See* D.I. 44 ¶ 560, stating a total purchase price of $4.4 million, with $2.5 million already tendered through cash and the 2017 Earn-Out).  Plaintiffs then allege: "It appears that TDS Operating transferred said assets to Transaction Data, Rx30 and/or GTCR for less than fair market value in an effort to deplete the assets of TDS Operating to cause it to be unable to pay its obligation to vMedex/Neuron."  (*Id.* ¶ 562).  Prior to this statement, nowhere does the Second Amended Complaint allege that TDS Operating claimed inability to pay the $1.9 million.  Plaintiffs maintain that Defendants schemed to avoid incurring the 2018 Earn-Out liability by underreporting customers and terminating StarGuard personnel.  If TDS Operating had moved assets intending to defraud Plaintiffs with a fabricated inability to pay, however, presumably TDS Operating would have offered that excuse to Plaintiffs.  It did not.

Second, Plaintiffs allege no supporting facts describing the circumstances of the transfer, offering only that "[i]t appears that TDS Operating transferred said assets to Transaction Data, Rx30 and/or GTCR."  (*Id.* ¶ 562).  Plaintiffs state that TDS Operating's books and records would reveal these transfers, if only Defendants had honored Plaintiffs' inspection rights under the APA.  Not only does this argument rely on an improper scope of Plaintiffs' inspection rights, (*see supra* Section III.A.1.b.), the unsupported allegations do not convince the Court that discovery will reveal evidence of fraudulent transfers.

Because Plaintiffs have failed to plead fraudulent transfer with particularity, as to both the intent to defraud and the transfer itself, this claim is dismissed.

### 6.     **Fraudulent Inducement (Count IX)**

A claim of fraudulent inducement requires that (1) the defendant falsely represented or omitted facts that the defendant had a duty to disclose, (2) the defendant made the false representation with knowledge or belief of its falsity, or reckless indifference to its veracity, (3) the defendant intended to induce the plaintiff to enter a contract, (4) the plaintiff justifiably relied on the representation, and (5) the plaintiff was injured as a result of its reliance.  *Mkt. Am., Inc. v. Google, Inc.*, C.A. No. 09–494–GMS, 2010 WL 3156044, at * 4 (D. Del. Aug. 9, 2010).

A plaintiff cannot make out a fraudulent inducement claim simply by showing that the defendants breached a promise to perform and alleging that the defendant never intended to perform at the time of its promise.  *AJZN, Inc.*, 2015 WL 331937, at *9.  Rule 9(b) imposes heightened pleading standards for fraudulent inducement, requiring that the plaintiff allege (1) the time, place, and contents of the false representation, (2) the person who made the representation, and (3) what the person intended to gain by making the false representation.  *Mkt. Am., Inc.*, 2010 WL 3156044, at *4 (citing *Winner Acceptance Corp. v. Return on Cap. Corp.*, C.A. No. 3088–VCP, 2008 WL 5352063, at *7 (Del. Ch. Dec. 23, 2008)).  These specifics are particularly important when the alleged false statement is a promise of future performance because the defendant must have notice of the accused statement in order to defend against the claim that it did not intend to perform at the time the statement was made.  *Fortis Advisors LLC*, 2015 WL 401371, at *7.  State of mind can be averred generally, but boilerplate conclusory allegations of knowledge, belief, or reckless indifference will not be credited.  *Mkt. Am., Inc.*, 2010 WL 3156044, at *4.

Here, Plaintiffs attempt to "bootstrap a breach of contract claim into a fraud claim simply by alleging [Defendants] never intended to perform its obligations."  *See AJZN, Inc.*, 2015 WL 331937, at *9.  Plaintiffs allege that TDS Operating and Wubker induced the APA by

misrepresenting during negotiations "their intent to advance [StarGuard] and maximize its value in the marketplace." (D.I. 44 ¶ 611). Besides stating that the fraudulent statements were made during APA negotiations, Plaintiffs provide no specific time, place, or contents of communication that would put Defendants on notice of the alleged misrepresentation.

Even if TDS Operating and Wubker had falsely told Plaintiffs they intended to advance StarGuard, Plaintiffs have not plausibly alleged that this misrepresentation was intended to fraudulently induce vMedex and Neuron to enter into the agreement. Plaintiffs allege that in APA negotiations, TDS Operating and Wubker candidly stated that they wanted to keep StarGuard from going to a competitor, (*id.* ¶ 613), that they likewise hired Individual Plaintiffs to prevent competitors from acquiring their talents, (*id.* ¶ 618), and that they intended to enter into the APA in part to settle the parties' dispute over the Joint Venture Agreement, (*id.* ¶ 612). The fact that TDS Operating and Wubker "candidly" admitted these other motives undermines the inferences that they intended to mislead Plaintiffs, and that Plaintiffs justifiably relied on the misrepresentation that Defendants intended to advance StarGuard. Thus, Plaintiffs' claim of fraudulent inducement is dismissed.

## B. **Employment Disputes**

### 1. **Breach of Implied Covenant of Good Faith and Fair Dealing (Count VII)**

#### a. **Individual Plaintiffs subject to Written Employment Agreements**

Seven Individual Plaintiffs – all but Patton and Schneider – executed written employment agreements with Rx30, which designated Delaware law to resolve any contractual disputes. Rx30 and its parent GTCR are Delaware entities. Thus, Delaware law bears a material relationship to the employment agreement with Individual Plaintiffs. The Court does not find this choice-of-law

provision offensive to public policy, and thus will apply Delaware law when assessing Plaintiffs' claims related to the written employment agreement.

Delaware courts recognize a narrow cause of action under the implied covenant of good faith and fair dealing for individuals terminated from at-will employment. *Lord v. Souder*, 748 A.2d 393, 400 (Del. 2000). Permissible claims fall into four exclusive categories: (1) the termination violates public policy, (2) the employer misrepresented an important fact and the employee relied on it when deciding to accept or remain in a position, (3) the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to past service, and (4) the employee falsified or manipulated employment records to create a fictitious grounds for termination. *Id.* (citing *E.I. Du Pont de Nemours & Co. v. Pressman*, 679 A.2d 436, 442–44 (Del. 1996)). Recognizing that the employment at-will doctrine is "already riddled with exceptions," Delaware courts have limited termination-based claims of breach of the implied covenant of good faith and fair dealing to these four narrow categories. *Id.* at 401.

### 1)      <u>Violation of Public Policy</u>

A claim that termination violates public policy must satisfy a two-part test: (1) the asserted public interest must be recognized by some legislative, administrative, or judicial authority and (2) the employee must occupy a position responsible for advancing or sustaining that particular interest. *Lord*, 748 A.2d at 401.

Plaintiffs fail to state a claim that their termination violated public policy. Plaintiffs allege two grounds on which Defendants violated public policy when terminating Individual Plaintiffs: that the layoffs constituted age discrimination, and that the layoffs were retaliatory because Individual Plaintiffs were formerly affiliated with vMedex and Neuron. Though Congress has recognized protection against age discrimination as a legitimate public interest, as in the Age Discrimination in Employment Act, (*see infra* Section III.B.2.), Plaintiffs have not alleged that

Individual Plaintiffs were hired for that purpose. Plaintiffs maintain that Defendants hired Individual Plaintiffs from vMedex and Neuron "to ensure continuity in the StarGuard product, maximize its integration into the Rx30 platform, and provide the prospect of the earn out the highest likelihood of success." (D.I. 44 ¶¶ 169–70). Individual Plaintiffs did not plead that they were hired to advance the public policy against discriminatory layoffs based on age. Plaintiffs also fail to plausibly allege that retaliatory termination based on corporate affiliation is a violation of public policy and they cite no legislative, administrative, or judicial authority for protecting this interest.

### 2)     Misrepresentation of Fact by Employer

Although Plaintiffs allege that "all four grounds" for breach of the implied covenant of good faith and fair dealing "are present in this case," (D.I. 44 ¶ 579), the Court can find no allegations supporting a claim that Defendants misrepresented facts that impacted Individual Plaintiffs' decisions regarding their employment. Even if Defendants' various misrepresentations were intended to support this claim, Individual Plaintiffs fail to show how they detrimentally relied on Defendants' misrepresentations when deciding to accept or remain in a position. *See Mitchell v. Cooper*, C.A. No. 14-1421-LPS, 2015 WL 5725766, at *4 (D. Del. Sept. 29, 2015) (requiring plaintiffs bringing a claim of breach of implied covenant of good faith and fair dealing to allege they relied on defendant's misrepresentations when remaining in position of employment).

### 3)     Deprivation of Compensation using Superior Bargaining Power

Plaintiffs allege Joseph Grosso and Robert Nixon were deprived of identifiable compensation for past service. Grosso was promised a raise, a cash bonus, and stock options for successfully establishing the call center to handle Rx30 customer service. Plaintiffs do not allege

that this denial was due to the superior bargaining power of TDS Operating, and so fail to state a claim of breach of the implied covenant of good faith and fair dealing.

### 4)      Falsification or Manipulation of Employment Records

Plaintiffs allege that Defendants engaged in deceit, fraud, and misrepresentation when laying off Individual Plaintiffs.  For its first phase of laying off StarGuard employees, Defendants claimed it was reducing its workforce, while still hiring aggressively for its call centers.  The second phase of StarGuard layoffs was allegedly for cause, pretextually attributed to employees' refusal to provide Defendants with StarGuard source code.  Even accepting these as pretexts, Plaintiffs fail to state a claim for breach of the implied covenant of good faith and fair dealing because they do not allege that Defendants falsified or manipulated employment records to create an explanation for the layoffs.  Strictly construing the fourth category, "[i]f the employer did not actually falsify or manipulate employment records, then it does not matter if the employer gave a false rationale for termination."  *Equal Emp. Opportunity Comm'n v. Avecia, Inc.*, 151 F. App'x 162, 165–66 (3d Cir. 2005).

### b.      Individual Plaintiffs without Written Employment Agreements

Patton and Schneider were employed by Defendants without written employment agreements containing choice-of-law provisions.  Plaintiffs contend that Patton's and Schneider's employment disputes nonetheless are governed by Delaware law because they received paychecks from TDS Operating, a Delaware corporation.  Meanwhile, Defendants argue that, without an employment contract, Delaware courts would apply the "most significant relationship" test to determine choice of law in a contract case.  (D.I. 47 at 20 (citing *Travelers Indem. Co. v. Lake*, 594 A.2d 38, 47 (Del. 1991)).  Defendants assert that, under the "most significant relationship" test, these employment disputes would be governed by the laws of either the state where Patton and Schneider worked – Texas and Wisconsin, respectively – or of the state where their employer

26

Transaction Data is incorporated, *i.e.*, Florida.  In their answer, Plaintiffs again state that all Individual Plaintiffs are paid by a Delaware corporation, without adducing authority to support the application of Delaware law.  (D.I. 48 at 20).

The Court need not decide which body of law governs this dispute because Plaintiffs have not stated a claim under any state's law.  If Delaware law controls, as Plaintiffs assert, Plaintiffs have not alleged any facts specific to Patton and Schneider that support a breach of the implied covenant of good faith and fair dealing for at-will employment.  Under Delaware law, Patton's and Schneider's claims of breach of the implied covenant fail just as they do for the other seven Individual Plaintiffs.  (*See supra* Section III.B.1.a.).  If Delaware law does not control, Plaintiffs claim fails because they have not attempted to state their claim under any other state's law.

Because Plaintiffs fail to state a claim of breach of the implied covenant of good faith and fair dealing for the termination of at-will employees the claim is dismissed.

### 2.    Violation of the ADEA (Count VIII)

The ADEA, in relevant part, prohibits an employer from failing or refusing to hire, discharging, or discriminating against any individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's age.  29 U.S.C. § 623(a)(1). The Supreme Court has held that a disparate treatment claim under the ADEA requires age to be the but-for cause of the adverse treatment.  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).  Accordingly, the ADEA does not allow mixed-motive age discrimination claims.  *Id.* at 175.

Plaintiffs have not alleged sufficient facts to create a reasonable inference that age was the but-for cause for their termination.  In support of the age discrimination claim, Plaintiffs adduce that only individuals over 40 were fired during the two waves of StarGuard layoffs.  Plaintiffs

argue that if age had not been the but-for cause of the layoffs, Defendants would have laid off some individuals under 40. Further, Plaintiffs claim the individuals laid off were able to perform the call center functions toward which Defendants were transitioning their workforce. These circumstantial allegations do not plausibly establish a but-for claim of age discrimination, especially given that they contradict Plaintiffs' other allegations about Defendants' improper business motives. Plaintiffs maintain that Defendants fired Individual Plaintiffs in order to shut down StarGuard and avoid paying the 2018 Earn-Out to vMedex and Neuron: "The firing of the nine individual Plaintiffs as set forth above left no one at Rx30 or Transaction Data capable of operating the StarGuard System. Without active maintenance, the system would break down and eventually become unusable by its customers. This was obviously part of the goal." (D.I. 44 ¶ 441).

Plaintiffs acknowledge that "the Court could credibly view this as a 'mixed motive' case," and they have provided other explanations of the terminations merely to put Defendants on notice. (*Id.* ¶ 601). In their answer, Plaintiffs contend that claiming both but-for and mixed-motive claims of age discrimination is permissible argument in the alternative. (D.I. 48 at 19). Indeed, Rule 8(d)(3) allows a party to plead separate claims, even if inconsistent. FED. R. CIV. P. 8(d)(3). The flaw in Plaintiffs' pleading is not that a mixed-motives claim contradicts or undermines the but-for claim required by the ADEA. Even ignoring a possible mixed-motive claim and viewing the facts most favorably to Plaintiffs, the allegations discussed above do not persuade the Court that age was the but-for cause of the layoffs.

Plaintiffs also shoehorn into their Second Amended Complaint an age discrimination claim under state law, stating only that Plaintiffs and Defendants are located in numerous states, which "may and do provide additional protections under their respective state laws." (D.I. 44 ¶¶ 598–

99).  Plaintiffs do not identify any specific state anti-discrimination causes of action or show how their allegations would support a claim under these state laws.  In their answering brief, Plaintiffs imply that some states may allow mixed-motive claims of age discrimination in employment, and that "pleading in the alternative is not precluded at this time."  (D.I. 48 at 19).  As discussed, pleading in the alternative is not precluded.  But Plaintiffs have not pleaded a mixed-motive age discrimination claim because they do not identify the state law on which their claims rely.

Thus, Plaintiffs' claim that Defendants violated the ADEA and various unspecified state anti-discrimination laws is dismissed.

### C.  Leave to Amend

Defendants have asked this Court to dismiss Plaintiffs' claims with prejudice because Plaintiffs have now amended their Complaint twice, and further amendment would be futile. (D.I. 47 at 7).  Rule 15(a)(2) requires that leave to amend be freely granted "when justice so requires."  FED. R. CIV. P. 15(a)(2).  A court may, however, deny leave to amend due to undue delay, bad faith, dilatory motive, prejudice, and futility.  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1434.  A finding of futility would mean that Plaintiffs would not be able to state a claim under Rule 12(b)(6) even upon further amendment.  *Id.*

Though Plaintiffs have had three opportunities to state the claims advanced in this Second Amended Complaint, and each complaint has been subject to a motion to dismiss for failure to state a claim, this Court has only now addressed the allegations substantively.  Rule 15(a)(2) counsels that Plaintiffs be given one last opportunity to amend their dismissed claims.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (D.I. 46) is GRANTED as to Counts II, III, V, VI, VII, VIII, and IX.  Defendants' motion to dismiss is GRANTED as to Count I for the claims of breach of contract regarding the 2017 Earn-Out and reimbursement of costs.

29

The motion to dismiss is DENIED as to Count I for the claims of breach of contract regarding the 2018 Earn-Out and the duty to consult.  An appropriate order will follow.