IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| VMEDEX, INC., NEURON DYNAMICS, LLC, BRENT PATTON, LORRAINE GROSSO, JOSEPH GROSSO, ROBERT NIXON, ERIC WESTBROOK, GARTH SCHNEIDER, MARK MCCURRY, CURT VAN CALSTER, JEFFREY WICKMAN, <br><br> Plaintiffs, <br><br> v. <br><br> TDS OPERATING, INC., TRANSACTION DATA SYSTEMS, INC., RX30 HOLDINGS, LLC, GTCR, LLC, JUDE DIETERMAN, STEVE WUBKER, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) C.A. No. 18-1662 (MN) ) ) ) ) ) ) ) ) |

## **MEMORANDUM OPINION**

Ann M. Kashishian, KASHISHIAN LAW LLC, Wilmington, Delaware. Marlo J. Hittman, LAW OFFICE OF MARLO J. HITTMAN, Livingston, NJ. *Counsel for Plaintiffs.*

Marc S. Casarino, WHITE & WILLIAMS LLP, Wilmington, Delaware. David M. Friebus, BAKER & HOSTETLER LLP, Chicago, Illinois. *Counsel for Defendants.*

May 3, 2021
Wilmington, Delaware

**NOREIKA, U.S. DISTRICT JUDGE**:

Plaintiffs vMedex, Inc. ("vMedex") and Neuron Dynamics, LLC ("Neuron"), and Brent Patton, Lorraine Grosso, Joseph Grosso, Robert Nixon, Eric Westbrook, Garth Schneider, Mark McCurry, Curt Van Calster, and Jeffrey Wickman (collectively, "Individual Plaintiffs") have sued Defendants TDS Operating, Inc. ("TDS Operating"), Transaction Data Systems, Inc. ("Transaction Data"), Rx30 Holdings, LLC ("Rx30"), and GTCR, LLC ("GTCR") (collectively, "Entity Defendants"), and Jude Dieterman and Steve Wubker, alleging five counts of contract liability related to asset purchase and employment agreements. (D.I. 60). Before the Court is Defendants' Motion to Dismiss (D.I. 65) Plaintiffs' Third Amended Complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion is fully briefed. (D.I. 66; D.I. 69; D.I. 70). For the following reasons, Defendants' Motion to Dismiss is GRANTED-IN-PART and DENIED-IN-PART.

## I. BACKGROUND

The Court assumes the parties' familiarity with the facts, as detailed in the Court's previous Opinion and Order granting-in-part and denying-in-part Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint. *See vMedex, Inc. v. TDS Operating, Inc.*, C.A. No. 18-1662 (MN), 2020 WL 4925512 (D. Del. Aug. 21, 2020). The relevant factual allegations from Plaintiffs' Third Amended Complaint are summarized below.

### A. The Parties

vMedex provides medication therapy management software to pharmacies, and Neuron is its majority shareholder. (D.I. 60 ¶¶ 26–28, 116). Individual Plaintiffs, other than Patton, worked for, held equity in, or were otherwise affiliated with vMedex and/or Neuron. (*Id.* ¶¶ 38, 120–21).

Entity Defendants are related corporate entities.[1] Wubker is former President and CEO of Transaction Data, (*id.* ¶ 200), positions currently held by Dieterman, (*id.* ¶¶ 200, 426).

At the direction of TDS Operating, Transaction Data, and Rx30, certain Individual Plaintiffs authored a computer program called StarGuard, which helps pharmacies meet performance obligations set by government reimbursement programs and insurance providers. (*Id.* ¶¶ 117, 119). StarGuard was integrated into the Rx30 software and deployed through the Rx30 interface. (*Id.*). This business arrangement between vMedex and Transaction Data was memorialized in a Joint Venture Agreement. (*Id.* ¶ 122).

B.  **The Asset Purchase Agreement**

In 2016, after a dispute over the Joint Venture Agreement arose between parties, Wubker proposed a new agreement whereby TDS Operating would acquire vMedex's assets, including StarGuard. (*Id.* ¶¶ 148–50). The agreement was negotiated primarily by Wubker and Grosso,[2] with John Kos, a member of parent company GTCR's Board of Directors, occasionally participating. (*Id.* ¶ 151). Wubker stated that the goal was not to make StarGuard profitable as a standalone product, but as an essential integrated element of the Rx30 software bundle. (*Id.* ¶¶ 154–55). Wubker represented that significant capital and personnel resources would be invested into the bundled product. (*Id.* ¶¶ 152, 156, 160). Wubker relied on Kos's participation in the negotiations to lend credibility to the promise that GTCR funding would be available to help

---

[1]  The Third Amended Complaint contains detailed allegations of the interrelated corporate identities of Entity Defendants. Those allegations were relevant to earlier disputes over diversity jurisdiction, choice of law, and piercing the corporate veil, (*see* D.I. 9; D.I. 24; D.I. 46; and related briefing). Those issues are not disputed in this motion to dismiss and thus are not detailed further.

[2]  For purposes of this Opinion, "Grosso" refers only to Joseph Grosso, not Lorraine Grosso.

grow StarGuard after acquisition. (*Id.* ¶¶ 153, 157–59). Plaintiffs allege that Defendants never committed, and never intended to commit, the resources promised to the project. (*Id.* ¶¶ 163–67).

On April 1, 2016, vMedex and Neuron entered into the negotiated Asset Purchase Agreement ("the APA") and thereby sold StarGuard to TDS Operating. (D.I. 66-2). The APA designates Delaware law to resolve disputes over the contract. (*Id.* § 9.6). Under the APA, vMedex and Neuron were eligible to receive earn-out payments based on number of customers at the end of both 2017 ("the 2017 Earn-Out") and 2018 ("the 2018 Earn-Out"). (*Id.* § 2.3). The APA defines "customers" as "unique pharmacy stores . . . that have entered into contracts to license the Seller's software products and/or the Seller's software services, and that have implemented such software products and/or services and remain customers in good standing" by yearend. (*Id.*). Under the agreement, customers of the Rx30 software bundle that included StarGuard would count toward the StarGuard customer base for calculation of earn-out payments. (*Id.* § 2.3.3). Upon TDS Operating's announcement of the earn-out calculation, vMedex and Neuron would have a thirty-day window to object to the calculation and inspect TDS Operating's books and records. (*Id.* § 2.4).

The APA also imposes on TDS Operating a duty to consult with vMedex and Neuron on the marketing and distribution of their products, but otherwise gives TDS Operating free rein over business decisions pertaining to the acquired assets:

> The Buyer [TDS Operating] will consult with representatives of the Seller [vMedex and Neuron], in good faith, regarding the appropriate marketing and distribution strategies for maximizing the 2017 Customer Base and the 2018 Customer Base, as applicable. However, notwithstanding the foregoing, the Parties acknowledge and agree that following the Closing, the Buyer shall have absolute discretion with regard to all matters relating to the operation of the Business.

(*Id.* § 2.6).

3

### C. Employment of Individual Plaintiffs

Around the time of the APA, all Individual Plaintiffs except Patton and Schneider were hired to the Clinical Services Division of Transaction Data, with Grosso serving as president of the division. (D.I. 60 ¶¶ 218, 369). These Individual Plaintiffs executed employment agreements that designated Delaware law to resolve contract disputes. (D.I. 66-3 § 5(g)). Later, Patton and Schneider were hired to the Clinical Services Division without executing written employment agreements. (*Id.* ¶¶ 220, 372, 376).

Grosso and Nixon each executed an Executive Unit Grant Agreement ("the EUGA") with Rx30. (D.I. 66-5[3]). The EUGA granted Grosso and Nixon units in Rx30, which were to vest over time. (*Id.* § 2(a)). Upon Grosso's or Nixon's separation from the company, their units would be either automatically forfeited or subject to a right of repurchase. (*Id.* § 3(a)). Wubker also promised Grosso a salary increase, incentive cash bonus, and stock options upon successful establishment of a StarGuard customer service call center. (D.I. 60 ¶¶ 396, 402, 405).

### D. Disputes over 2017 Earn-Out and Layoff of Individual Plaintiffs

In March 2018, TDS Operating announced that vMedex and Neuron did not qualify for the 2017 Earn-Out. (*Id.* ¶ 329). vMedex and Neuron challenged this conclusion, and after a drawn-out dispute between parties, in July 2018, Defendants paid vMedex and Neuron an earn-out of $1.5 million. (*Id.* ¶ 345).

Around the time of this dispute, Defendants began laying off employees assigned to work on StarGuard. (*Id.* ¶ 395). On March 23, 2018, Wickman, Schneider, McCurry, and Van Calster were terminated from the Clinical Services Division. (*Id.* ¶¶ 438). Although Defendants claimed

---

[3]  For purposes of this Opinion, the Court cites to the EUGA executed by Grosso. (D.I. 66-5). The EUGA executed by Nixon is substantially identical, except for identifying information. (D.I. 66-6; *see* D.I. 69 at 10).

the terminations were due to lack of work, the reduction in force coincided with a reported surge in hiring for the Clinical Services Division. (*Id.* ¶ 440). Around June 12, 2018, Rx30 terminated Joseph and Lorraine Grosso, Nixon, Westbrook, and Patton. (*Id.* ¶ 453). These individuals were required to admit in writing that they were terminated for cause, although the cause was not specified. (*Id.* ¶ 481). The implied reason for termination was that these individuals did not provide the StarGuard source code to Defendants when asked. (*Id.*). Grosso and Nixon alleged that they "continue, through tax year 2019, to receive K-1's, evidencing that they are still considered holders of the relevant unit grants in Defendants' accounting system . . . ." (*Id.* ¶ 244).

### E. Shut Down of StarGuard

By mid-2018, the number of StarGuard customers exceeded the threshold for vMedex and Neuron to qualify for the 2018 Earn-Out. (*Id.* ¶ 347). Around August 15, 2018, Rx30 disabled access to StarGuard on the Rx30 platform. (*Id.* ¶¶ 499–500). Shutting down operation of or customer access to StarGuard, however, did not shut down the existing StarGuard licenses or unbundle them from the Rx30 program. (*Id.* ¶¶ 312, 508). Defendants have not paid the 2018 Earn-Out or allowed vMedex and Neuron to inspect the books and records of TDS Operating in connection to the earn-out. (*Id.* ¶¶ 361, 366).

### F. Procedural History

Plaintiffs filed a Second Amended Complaint alleging breach of the APA (Count I); breach of the implied covenant of good faith and fair dealing as to the APA (Count II); tortious interference with the APA (Count III), piercing the corporate veil (Count V); fraudulent conveyance (Count VI); breach of the implied covenant of good faith and fair dealing as to the employment contracts (Count VII); violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (Count VIII); and fraudulent inducement as to the APA (Count IX). (D.I. 44). Defendants moved to dismiss the Second Amended Complaint for failure to state a

claim. (D.I. 46). The Court granted the motion to dismiss for all counts except breach of the APA (Count I) based on a duty to consult and obligations related to the 2018 Earn-Out. *vMedex*, 2020 WL 4925512, at *15.

On September 11, 2020, Plaintiffs filed the Third Amended Complaint (D.I. 60), realleging Counts I, II, VII, and IX and adding a claim for breach of the EUGA (Count X). Defendants move to dismiss the Third Amended Complaint in its entirety for failure to state a claim under Rule 12(b)(6). (D.I. 66).

## II. <u>LEGAL STANDARDS</u>

When deciding a motion to dismiss under Rule 12(b)(6), the Court must accept all well-pleaded factual allegations as true and view these in the light most favorable to the plaintiff. *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010). To survive a motion to dismiss, a complaint must plead sufficient factual matter to support "the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In other words, the complaint must "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint does not need detailed factual allegations, but must contain "more than labels and conclusions" and a "formulaic recitation of a cause of action's elements." *Id.* The Court, however, "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429–30 (3d Cir. 1997)) (internal quotation marks omitted).

**III.  DISCUSSION**

   **A.   The Asset Purchase Agreement**

   **1.   Breach of Contract (Count I)**

Despite the Court's previous partial dismissal of Plaintiff's breach of contract claim, the alleged breaches listed under Count I remain unchanged. First, Plaintiffs allege that TDS Operating failed to timely pay the 2017 Earn-Out and subsequently failed to allow inspection of books and records. (D.I. 60 ¶¶ 527, 529). Second, they allege that TDS Operating is liable for the costs Plaintiffs incurred to collect the earn-out payments, as well as the cost of computer servers and certificates needed to operate StarGuard. (*Id.* ¶ 528). Third, they allege that TDS Operating breached its obligation to pay the 2018 Earn-Out and honor inspection rights related to this payment. (*Id.* ¶¶ 533–35). Fourth, they allege that TDS Operating failed to consult with Plaintiffs in good faith to strategize maximizing the StarGuard customer base. (D.I. 66 ¶¶ 519–22, 525).

The Court previously dismissed Plaintiffs' breach of contract claim based on the 2017 Earn-Out and the alleged obligation to reimburse costs. *vMedex*, 2020 WL 4925512, at *7–8. The Third Amended Complaint does not add allegations that support a claim based on these grounds. Indeed, Plaintiffs concede that the alleged breach of the 2017 Earn-Out provisions are "now moot." (D.I. 60 ¶ 344). Thus, Plaintiffs' breach of contract claim is dismissed as to these previously alleged and rejected grounds.

The Court allowed Plaintiffs to proceed with Count I based on the 2018 Earn-Out and a duty to consult. *vMedex*, 2020 WL 4925512, at *6–7. As to the 2018 Earn-Out, the Court found that, despite Defendants' alleged shut-down of StarGuard, it was plausible that discovery would reveal evidence that Plaintiffs had earned the 2018 Earn-Out and TDS Operating breached its duty to pay it. Defendants argue that Plaintiffs have amended themselves out of their surviving claim by adding allegations that Rx30 "shut down the operations of StarGuard" and "destr[oyed] . . .

7

StarGuard as an operational service." (D.I. 66 at 9–11 (citing (D.I. 60 ¶¶ 291, 293, 312))). Defendants assert that if StarGuard was not operational, then no user of StarGuard qualified as a "customer" that had "implemented" StarGuard by the end of 2018. (*Id.* at 10). The Court disagrees that Plaintiffs' amendment, although unnecessary, is inconsistent with Plaintiffs' claim in the Second Amended Complaint that StarGuard was "shut down." To the extent Plaintiffs' amendment creates ambiguity, the Court resolves the ambiguity in Plaintiffs' favor. For the reasons stated in the Court's previous Opinion, it is reasonably inferable that vMedex and Neuron earned the 2018 Earn-Out and TDS Operating breached its corresponding duties.

As to the duty to consult, the Court found that Plaintiffs had plausibly alleged that TDS Operating's failure to consult on marketing and distribution of StarGuard injured vMedex and Neuron by reducing their customer base and earn-out payments. Defendants argue that Plaintiffs, having amended themselves out of a cause of action based on the 2018 Earn-Out, have alleged no injury and their claim of breach of the duty to consult must be dismissed. (D.I. 66 at 12 n.2). As stated above, the Court disagrees. Plaintiffs have plausibly alleged injury from breach of the 2018 Earn-Out provisions, and therefore may proceed with their breach of contract claim based on duty to consult.

Thus, Count I is again dismissed, except based on alleged breach of the 2018 Earn-Out provisions and the duty to consult under the APA.

### 2. Breach of Implied Covenant of Good Faith and Fair Dealing (Count II)

Plaintiffs reallege that Defendants breached the implied covenant of good faith and fair dealing as to the APA. Under the implied covenant of good faith and fair dealing, parties to a contract must "refrain from arbitrary or unreasonable conduct which has the effect of preventing the other party to the contract from receiving the fruits of the bargain." *Luster v. PuraCap Labs., LLC*, C.A. No. 18-503 (MN), 2018 WL 6492583, at *2 (D. Del. Dec. 10, 2018). An implied

8

covenant "only applies where a contract lacks specific language governing an issue." *Haney v. Blackhawk Network Holdings, Inc.*, C.A. No. 10851-VCN, 2016 WL 769595, at *8 (Del. Ch. Feb. 26, 2016). Even when the Court finds a gap in a contract, it will only read in an implied covenant if the term were so fundamental that the parties would not have needed to negotiate or memorialize it. *Allied Cap. Corp. v. GC-Sun Holdings, LP*, 910 A.2d 1020, 1032–33 (Del. Ch. 2006).

Plaintiffs assert two implied terms of the APA. First, Plaintiffs state that "[i]t was implied that TDS Operating would operate StarGuard until the end of the 2018 earn-out period," and by discontinuing StarGuard operations, or alternatively by incorporating StarGuard source code into the Rx30 product, TDS Operating breached an implied covenant. (D.I. 60 ¶¶ 354, 511, 552). Plaintiffs previously advanced a similar argument, which the Court rejected, stating:

> Plaintiffs essentially ask the Court to infer additional protections for vMedex and Neuron, arguing that they would not have entered into an agreement that did not protect their interests. The Court, however, will not add terms when it is apparent that the parties already considered and bargained for them. *See Nemec v. Shrader*, 991 A.2d 1120, 1126 (Del. 2010).

*vMedex*, 2020 WL 4925512, at *9. The same principle applies here. The APA states under "Post-Closing Operation of the Business" that, notwithstanding the duty to consult, "the Buyer shall have absolute discretion with regard to all matters relating to the operation of the Business." (D.I. 66-2 § 2.6). The express grant of "absolute discretion" to TDS Operating cannot be squared with an inference that TDS Operating was obligated to operate StarGuard until the end of 2018. Furthermore, the express duty to consult undermines the inference that TDS Operating had other implied obligations under the APA.

Plaintiffs assert, "[i]t was also implied that during the earnout period, TDS Operating would be responsible for the costs associated with operating the business," and TDS Operating has breached this covenant by not reimbursing costs. (*Id.* ¶ 553). Plaintiffs provide no basis to

9

reasonably infer that the parties intended TDS Operating to assume these costs. Nor is this obligation "so fundamental" that vMedex and Neuron should have expected it to go without saying. *See Allied Cap.*, 910 A.2d at 1032–33. Indeed, the APA memorializes "Assumption and Exclusion of Liabilities" with no mention of either party assuming operating costs. The Court will not read into the APA either party's liability for these costs.

Thus, Plaintiffs fail to state a claim that Defendants breach an implied covenant of good faith and fair dealing as to the APA, and Count II is dismissed.

### 3. Fraudulent Inducement (Count IX)

Plaintiffs allege that TDS Operating and Wubker made false statements to induce vMedex and Neuron to enter the APA.[4] (D.I. 60 ¶ 584). A claim of fraudulent inducement requires that defendant (1) falsely represented or omitted facts that the defendant had a duty to disclose, (2) had knowledge or belief of its falsity, or reckless indifference to its veracity, and (3) intended to induce plaintiff to enter a contract; and plaintiff (4) justifiably relied on the representation and (5) was injured as a result of its reliance. *Mkt. Am., Inc. v. Google, Inc.*, C.A. No. 09-494-GMS, 2010 WL 3156044, at *4 (D. Del. Aug. 9, 2010). To satisfy the pleading standard of Rule 9(b) of the Federal Rules of Civil Procedure, a plaintiff alleging fraudulent inducement must provide (1) the time, place, and contents of the false representation, (2) the person who made the representation, and (3) what the person intended to gain by making the false representation. *Id.* To allege fraudulent promises of future performance, "a plaintiff must plead specific facts that lead to a reasonable

---

[4] The Third Amended Complaint adds GTCR to this count. Defendants argue that Plaintiffs' addition of GTCR is improper because Plaintiffs did not seek leave of court to make this amendment. (D.I. 66 at 14–15). Plaintiffs do not respond to this argument, and therefore the Court considers Count IX to be alleged against TDS Operating and Wubker.

inference that the promisor had no intention of performing at the time the promise was made." *AJZN, Inc. v. Yu*, Civil Action No. 13-149 GMS, 2015 WL 331937, at *9 (D. Del. Jan. 26, 2015).

Plaintiffs allege that Wubker made "false statements about the existence of financial and non-financial resources that were being committed to the project" of growing StarGuard as a component of the Rx30 software. (D.I. 60 ¶ 584). Plaintiffs allege that Wubker knew at the time of his statement that no financial or non-financial commitment to StarGuard was forthcoming. (*Id.* ¶¶ 587–88). These "general averment[s] of a culpable state of mind [are] insufficient" to plead a fraudulent promise of future performance. *AJZN, Inc.*, 2015 WL 331937, at *9. Plaintiffs also aver, as in the Second Amended Complaint, that it can be inferred from "[t]he complete abrogation of all tasks necessary to fulfill the contract from the beginning . . . that there was never an intent to comply with its terms when made." (*Id.* ¶ 589). "Mere evidence," however, "of a party's failure to keep a promise does not prove the promise was false when made." *AJZN, Inc.*, 2015 WL 331937, at *9 (internal quotation marks omitted). Plaintiffs pleaded no facts from which it can be inferred that Wubker's statements were false when made. Accordingly, Count IX is dismissed.

B.  **Employment Agreements**

1.  **Breach of Implied Covenant of Good Faith and Fair Dealing in the Employment Agreements (Count VII)**

Plaintiffs allege that Individual Plaintiffs were terminated by Defendants in violation of the implied covenant of good faith and fair dealing under their respective at-will employment arrangements. Generally, at-will employment can be terminated by either party, for any reason, with or without cause, and at any time. *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 103 (Del. 1992). Delaware courts,[5] however, recognize four strictly construed categories of bad-faith

---

5     Plaintiffs assert, and Defendants do not contest, that Delaware law should apply to the employment disputes, including as to Patton and Schneider, who did not execute written

11

termination that give rise to a claim of breach of the implied covenant of good faith and fair dealing: (1) the termination violates public policy, (2) the employer misrepresented an important fact and the employee relied on it when deciding to accept or remain in a position, (3) the employer used its superior bargaining power to deprive an employee of clearly identifiable compensation related to past service, and (4) the employer falsified or manipulated employment records to create fictitious grounds for termination. *Lord v. Souder*, 748 A.2d 393, 400 (Del. 2000) (citing *E.I. Du Pont de Nemours & Co. v. Pressman*, 679 A.2d 436, 442–44 (Del. 1996)).

For the following reasons, Plaintiffs fail to allege breach of the implied covenant of good faith and fair dealing as to termination of Individual Plaintiffs' at-will employment.[6]

### 1) Violation of Public Policy

Plaintiffs allege that Individual Plaintiffs who were terminated for failing to provide the StarGuard source code "were essentially penalized for refusing to steal, which is . . . contrary to public policy." (D.I. 60 ¶ 577). To assert a claim that a termination violates public policy, a plaintiff must identify a public interest recognized by some legislative, administrative, or judicial authority and allege that the terminated employee occupied a position responsible for advancing or sustaining that particular interest. *Lord*, 748 A.2d at 401. For example, in *Shearin v. E.F. Hutton Group, Inc.*, the court allowed a claim of termination in violation of public policy where an attorney was fired for refusing to violate the attorney ethics code to which she was bound. 652 A.2d 578, 587–89 (Del. Ch. 1994). *See also Marino v. Cross Country Bank*, No. C.A.02-65-

---

employment agreements. (D.I. 69 at 9–10; D.I. 70 at 8 n.1). Thus, the Court applies Delaware law to the employment claims of all Individual Plaintiffs.

[6] Plaintiffs have not clearly identified, and the Court cannot discern from the 614-paragraph Third Amended Complaint, what factual allegations, if any, support a claim of reliance on an employer's misrepresentation when deciding to accept or remain in a position. Thus, the Court does not consider the merits of a claim based on that exception.

GMS, 2003 WL 503257 at *3–*4 (D. Del. Feb. 14, 2003) (allowing claim of breach of implied covenant based on allegations that employer terminated plaintiff attorney for investigating employer's unethical and illegal banking practices). The narrow "violation of public policy" exception does not apply if the plaintiff's duties as an employee do not extend to the matter for which the plaintiff was allegedly terminated. *Shearin*, 652 A.2d at 588 (citing *Geary v. United States Steel Corp.*, 319 A.2d 174, 178–79 (Pa. 1974) (dismissing breach of implied covenant claim based on plaintiff's termination for reporting employer's defective products, when plaintiff was a salesman and not responsible for product safety)). Assuming there is a public policy against theft, Plaintiffs do not allege that Individual Plaintiffs were responsible for advancing that interest and that their termination harms the antitheft public policy. Plaintiffs' claim based on violation of public policy fails.

### 2) Deprivation of Compensation using Superior Bargaining Power

Plaintiffs allege that Defendants deprived Individual Plaintiffs of compensation using superior bargaining power. Other jurisdictions have explained the type of conduct that shows abuse of superior bargaining power to deprive employees of earned compensation for past services:

> Where the principal seeks to deprive the agent of all compensation by terminating the contractual relationship when the agent is on the brink of successfully completing the sale, the principal has acted in bad faith and the ensuing transaction between the principal and the buyer is to be regarded as having been accomplished by the agent. The same result obtains where the principal attempts to deprive the agent of any portion of a commission due the agent. Courts have often applied this rule to prevent overreaching by employers and the forfeiture by employees of benefits almost earned by the rendering of substantial services.

*Fortune v. Nat'l Cash Register Co.*, 364 N.E.2d. 1251, 1257 (Mass. 1977) (citing Restatement (Second) of Agency § 454, Comment a (1958)). *See also Zimmer v. Wells Mgmt. Corp.*, 348 F. Supp. 540, 543 (S.D.N.Y. 1972) (denying summary judgment where question remained "whether

13

plaintiff's discharge from his employment by defendants was made in bad faith and for the purpose of depriving plaintiff of the benefits of the contract and escrow arrangement"); *Wagenseller v. Scottsdale Mem'l Hosp.*, 710 P.2d 1025, 1040 (Ariz. 1985) (finding that implied covenant protected plaintiff from "discharge based on an employer's desire to avoid the payment of benefits"); *Pressman*, 679 A.2d at 441 (citing *Fortune*, *Zimmer*, and *Wagenseller* with approval). Thus, a typical claim for breach of implied covenant under the "superior bargaining power" exception arises when an employer terminates an employee in order to avoid paying compensation or benefits that the employee has almost earned.

Plaintiffs allege that Defendants used their superior bargaining power (1) to deprive Grosso of compensation for past services related to the StarGuard call center, (2) to deprive Grosso and Nixon of compensation under the EUGA, and (3) to cause Individual Plaintiffs to steal the StarGuard source code. (D.I. 60 ¶¶ 457, 464, 468, 573–74, 578). The Court previously faulted Plaintiffs for failing to allege Defendants' abuse of superior bargaining power. *vMedex*, 2020 WL 4925512, at *13. Plaintiffs appear to have amended their defective pleading simply by sprinkling the phrase "superior bargaining power" throughout, but have not alleged facts to support this narrow cause of action. First, Plaintiffs allege that Grosso did successfully establish the StarGuard call center and was denied his promised compensation, not that Defendants terminated Grosso before he could earn the benefits. (D.I. 60 ¶ 412). Second, Plaintiffs allege that Grosso and Nixon did receive, and still hold, the promised incentive units under the EUGA, not that Defendants terminated Grosso and Nixon in order to avoid giving them the promised incentive units. (*Id.* ¶ 244). Further, to the extent Plaintiffs argue that Defendants used superior bargaining power to avoid an alleged obligation to repurchase Grosso's and Nixon's vested incentive units, that argument fails, as discussed in connection to Count X. *See supra* Section III.B.2. Third, Plaintiffs'

14

allegation that Defendants forced Individual Plaintiffs to steal source code is not an abuse of superior bargaining power contemplated by the narrow exception.

### 3) Falsification or Manipulation of Employment Records

The heart of Plaintiffs' Count VII is that Defendants gave pretextual reasons – namely, "reduction in force" and failure to provide the StarGuard source code when requested – for terminating Individual Plaintiffs.[7] (D.I. 60 ¶ 575). A claim for falsification or manipulation of employment records is based on "an act or acts of the employer manifesting bad faith or unfair dealing achieved by deceit or misrepresentation in falsifying or manipulating a record to *create* fictitious grounds to terminate employment." *Pressman*, 679 A.2d at 443–44 (emphasis added). If, however, "the employer did not actually falsify or manipulate employment records, then it does not matter if the employer gave a false rationale for termination." *Equal Emp. Opportunity Comm'n v. Avecia, Inc.*, 151 F. App'x 162, 165 (3d Cir. 2005).

The Court previously dismissed this claim because Plaintiffs did not allege that Defendants falsified records to create an explanation for the layoffs. *vMedex*, 2020 WL 4925512, at *13. Plaintiffs now allege that Defendants "falsif[ied] the individual Plaintiffs['] employment files to make it appear that they had failed to do something they had a duty to do, when in fact[] no such duty existed." (D.I. 60 ¶ 576). Plaintiffs argue that "the Court engaged in too narrow an interpretation of law" and that their amendments suffice under *Pressman* because they now allege "manufacture" rather than a mere "statement" of pretextual reasons for termination. (D.I. 69 at 17–18 (citing 679 A.2d 436)). Plaintiffs are mistaken. In *Pressman*, plaintiff's supervisor presented false reports and records to the supervisor's superiors, which caused plaintiff to be

---

[7] In their brief opposing the motion to dismiss, Plaintiffs do not defend or even mention their conclusory allegations of violation of public policy and abuse of superior bargaining power. (*See* D.I. 69 at 17–19).

15

terminated. 679 A.2d at 439, 444. In other words, the supervisor's falsified records became the reason for termination and thus supported a wrongful termination claim. *Id.* at 444. The opposite is alleged here: reduction in force and failure to provide source code were the purportedly pretextual reasons given to Individual Plaintiffs, but were not the real reasons for their termination. *See Avecia*, 151 F. App'x at 165 (rejecting employee's wrongful termination claim because "even if we assume that Stepler was subjected to false criticisms of her work performance and false claims that she was using work time to study, there is no evidence that these particular criticisms and claims *were the grounds* for Stepler's termination." (emphasis added)). Indeed, Plaintiffs allege that Transaction Data, Rx30, and TDS Operating "jointly" dismissed Individual "to help TDS Operating avoid responsibility for the APA 2018 earn out payment." (D.I. 60 ¶ 437). Plaintiffs thus fail to state a claim of bad-faith termination based on manipulated employment records.

In summary, Plaintiffs fail to allege breach of the implied covenant of good faith and fair dealing for at-will employment under any of the four narrowly construed categories of bad-faith termination, and thus Count VII is dismissed.

### 2. Breach of the EUGA (Count X)

Plaintiffs allege that, "[u]nder the EUGA . . . Defendants were required to purchase all the unit grants vested at the time of [Grosso and Nixon's] separation." (D.I. 60 ¶ 605). According to Plaintiffs, Defendants have not repurchased Nixon and Grosso's vested units, and thus Defendants have breached the EUGA.[8] (*Id.* ¶ 244).

---

[8] As a threshold matter, Defendants argue that this count should be dismissed because Plaintiffs unduly delayed and did not seek leave of Court to add this claim. (D.I. 66 at 18). Plaintiffs claim that "Counsel did not have the [EUGA] nor the details thereof until the most recent pleading." (D.I. 69 at 6). In response, Defendants direct the court to a filing by Plaintiffs' counsel on January 22, 2019 – predating even the Second Amended

The EUGA provides:

> Forfeiture; Repurchase Option. In the event of a Separation,[9] (i) all Unvested Incentive Units . . . automatically (without any action by Executive or any of Executive's transferees) will be *forfeited* to the Company and deemed canceled and no longer outstanding without any payment therefor, and (ii) all Vested Incentive Units . . . will be subject to a *right of repurchase* by the Company and the Investors pursuant to the terms and conditions in this Section 3 (the "*Repurchase Option*"). . . . [I]f such Separation results from the Company's termination of Executive with Cause (as defined in the Employment Agreement), in addition to forfeiting all Unvested Incentive units . . . , all Vested Incentive Units . . . will automatically . . . be forfeited to the Company and deemed canceled . . . .

(D.I. 66-5 § 3(a) (emphases added); *see also id.* § 3(c) (stating that Rx30 "may elect to purchase" vested units by written notice, within seven months of separation, setting forth the number of units Rx30 has elected to purchase)). In short, upon termination without cause, unvested units are forfeited and vested units may be repurchased by Rx30. If termination is with cause, both unvested and vested units are forfeited.

The parties dispute whether Grosso's and Nixon's terminations were genuinely for cause, because upon termination for cause, all incentive units held by Grosso and Nixon would be forfeited and canceled. (D.I. 66 at 18–19; D.I. 69 at 19–20; D.I. 70 at 9–10). Even if Grosso and Nixon had been terminated without cause, however, Plaintiffs have not stated a claim for breach of the EUGA. Upon termination without cause, Rx30 would have a right, not an obligation, to repurchase the vested units. Meanwhile, all unvested units would be automatically forfeited. Even

---

Complaint – which includes a copy of the EUGA as executed by Nixon. (D.I. 70 at 9 (citing D.I. 21-2 at 77–95)).

[9] The EUGA defines "separation" as Grosso or Nixon "ceasing to be employed by [Rx30] or any of its Subsidiaries for any reason." (D.I. 66-5 § 5).

if Plaintiffs were to allege breach of the EUGA for Rx30's failure to effect automatic forfeiture of unvested units, Plaintiffs have not alleged injury for that breach. Thus, Count X is dismissed.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (D.I. 65) is GRANTED as to Counts II, VII, IX, and X. The motion is GRANTED as to Count I, except as to breach of contract claims based on the 2018 Earn-Out provisions and Defendants' duty to consult. As Plaintiff has had multiple attempts to replead its claims, all of the dismissed counts are dismissed with prejudice other than Count X, which the Court will provide a limited opportunity to try to amend as discussed during the May 3, 2021 teleconference.

An appropriate order follows.